OPINION
Appellant, the Estate of Sanford Davis, appeals the judgment entry of the Ashtabula County Court of Common Pleas, Probate Division, in which it ruled in favor of appellee, the Estate of Reva Davis, with respect to the claims asserted by appellant in his complaint for declaratory judgment regarding the disposition of the assets in his former wife's estate, and his request to set aside the antenuptial contract executed by the parties.
On March 27, 1983, Sanford Davis ("Sanford") and Reva Davis ("Reva") were married in Euclid, Ohio. Prior to that marriage, on March 7, 1983, both parties entered into an "Agreement in Contemplation of Marriage." The antenuptial agreement expressly stated that it was a "marital property agreement under the provisions of Article No. 5.41 of the Texas Family Code, Subchapter C, Property Agreements."
In that agreement, Reva's property was described as including: (1) ownership in fee simple of an undivided one-third interest in 3,460 acres of land situated in Jasper and Newton Counties, Texas, together with rights to all timber and all underground oil, gas, and other mineral rights; (2) ownership of corporate stock in American Telephone and Telegraph Corp., Cleveland Electric Co., General Motors Corp., Gulf Oil Corp., Fulg States Utilities Co., National Steel Corp., Uniroyal Corp., Marine Midland Bank, and Society Corp.; and (3) ownership of bank accounts, certificates of deposit, interest, household furniture, and an automobile. The agreement further stated that Sandford owns a building in Ohio and possesses cash.
Regarding the Texas property owned by Reva, the record shows that she inherited her one-third interest in June 1978 from her former husband, Eugene Karpel. The record also indicates that the remaining two-third's interest was inherited by Mark Karpel ("Mark") in 1986 from Eugene Karpel's brother, Jerome. From 1978 to 1993, the income and expenses associated with the land were allocated between the owners on an equal basis, regardless of who actually managed the productive land. Moreover, Reva managed the land from 1978 to 1985, and acted as the bookkeeper from 1978 to 1993. In 1993, Mark assumed full control of the financial management of the land, marking the beginning of income allocation according to their one-third and two-third's ownership rights. Finally, checks for oil and gas lease payments were made to Reva and Mark separately after September 1993. For the same time period, proceeds from timber sales were divided by Mark, and one-third of the profits was paid to Reva by checks drawn on his "Magnolia Creek Farms" account.
Also, Reva and Mark reported their income from the property separately on their own federal income tax returns by filling out a Schedule "C." No partnership federal tax returns were ever prepared or filed by Reva or Mark for the Texas real estate. At the time of Reva's death, the Texas property had a fair market value of $2,365,000.
In addition to the Magnolia Creek Farms account, there existed a "Forestry Account" at the State Bank of Jasper until Reva's death, at which time the account was closed and a check for one-third of the balance was issued to appellee, Reva's estate, with the remaining two-thirds going to Mark. The Forestry Account was used for emergency purposes relating to the Texas property and for paying property taxes on it. All income was placed into the Forestry Account until the Magnolia Creek Farms account was opened. No proceeds were withdrawn from the Forestry Account after 1993.
After their date of marriage, Sanford and Reva resided as husband and wife for the next eleven years, spending part of each year residing in Beaumont, Texas and Ashtabula, Ohio. In February 1994, Reva purchased a home in Ashtabula, Ohio, and remained there with Sanford until her death on April 25, 1995. During the entire time that she remained in Ohio, Reva maintained assets both in Texas and Ohio.
Importantly, Reva died testate, and her will was admitted into probate by the Probate Court of Ashtabula County on May 9, 1995. As part of her will, Reva left to Sanford a bequest of $25,000 and the right to live in her residence for two years provided that he pay all maintenance costs of that residence, including real estate taxes and fire insurance. Zelda Altman and Lynn Alexander were duly appointed co-executors of Reva's estate. On August 18, 1995, Sanford filed an election in the probate court to take against Reva's will.
On August 30, 1995, Sanford filed a complaint in the Ashtabula County Probate Court for declaratory judgment, requesting that the court set aside the antenuptial agreement. On December 13, 1996, Sanford died, and his estate was substituted as a party for him in this action on March 27, 1997. Importantly, the foregoing facts were undisputed and derived from the stipulation of facts filed before the probate court, as well as, the court's judgment entries.
In an August 18, 1998 judgment entry, the probate court ruled on appellant's (now Sanford's estate) complaint in favor of appellee. Appellant now asserts the following assignments of error on appeal:
 "[1.] The trial court erred to the prejudice of Plaintiff-Appellant [sic] in ruling that Texas law, not Ohio law, is the appropriate choice of law in this case.
 "[2.] The trial court erred in ruling that the Antenuptial Agreement [sic] is valid.
 "[3.] The trial court erred in ruling that Reva Davis' ownership of the Texas property was not held by a partnership interest, and therefore not includable as an asset in Reva Davis' Ohio probate [sic] estate."
In the first assignment of error, appellant avers that the antenuptial agreement is a contract and, hence, should be governed by the law of the place of performance rather than the place of execution. Therefore, appellant argues that Ohio law should govern the agreement since both Sanford and Reva were married in Ohio, resided in Ohio for part of each year of their marriage, and Reva's will was executed and probated in Ohio. Thus, appellant claims that Texas law has no significant relationship to the agreement.
In Schulke Radio Productions, Ltd. v. Midwestern BroadcastingCo. (1983), 6 Ohio St.3d 436, syllabus, the Supreme Court of Ohio held:
 "The law of the state chosen by the parties to govern their contractual rights and duties will be applied unless either the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or application of the law of the chosen state would be contrary to the fundamental policy of a state having a greater material interest in the issue than the chosen state and such state would be the state of the applicable law in the absence of a choice by the parties."
Although appellant correctly contends that Ohio was the state in which Sanford and Reva were married and resided for part of each year, as well as, the fact that Reva's will was executed and probated in Ohio, the antenuptial agreement expressly provides that Texas law is to govern the agreement. Indeed, the agreement contains the following language:
 "WHEREAS, each has property, both real and personal, acquired by each prior to said date of March 27, 1983, and it is the desire of both parties that each should retain all ownership of the properties owned by either prior to their marriage, therefore, each desires to enter into a marital property agreement under the provisions of Article No. 5.41 of the Texas Family Code, Subchapter C, Property Agreements: * * *"
Importantly, the antenuptial agreement was executed in Texas prior to the Ohio marriage. Additionally, the facts reveal that except for the last year of Reva's life, both she and Sanford lived in Texas for part of each year of their marriage. Moreover, Reva maintained at least one bank account in Texas and the large land interest she had was in land also situated in Texas.
In reviewing the antenuptial agreements, it clearly demonstrates that Sanford and Reva both intended that it would be governed by Texas law. The factual record further shows that Texas has substantial contacts with the antenuptial agreement by virtue of the fact that Reva's large land interest is located there, she maintained at least one bank account in Texas, and the antenuptial agreement was signed in that state. Also relevant to the substantial contacts evaluation is the fact that Sanford and Reva resided in Texas for part of each year of the first eleven years of their twelve year marriage. Thus, we conclude that the standards articulated in Schulke have been met and the trial court properly determined that the antenuptial agreement should be governed by the laws of Texas. Therefore, appellant's first assignment of error is without merit.
In his second assignment of error, appellant argues that the antenuptial agreement is invalid because he received a disproportionate share under it, and the agreement failed to provide a fair and reasonable disclosure of Reva's property interests at the time of signing because the value of each asset was not provided.
As this court has already indicated that the antenuptial agreement is governed by Texas law, the resolution of this issue lies in a consideration of Texas law as it relates to the antenuptial agreement.
Under the law of Texas, antenuptial agreements are presumed valid and the burden to prove that such agreement is invalid rests with the challenging party. Grossman v. Grossman (Tex.App. 1990),799 S.W.2d 511, 513. To prove that an antenuptial agreement is invalid, the challenging party must show that he or she did not execute the agreement voluntarily or that it was unconscionable at the time of execution and the challenging party: (1) was not provided a fair and reasonable disclosure of the other party's property or financial obligations; (2) did not, in writing, voluntarily waive any right to disclosure of the other party's property or financial obligations beyond the disclosure provided; and (3) did not have, or could not reasonably have had, adequate knowledge of the other party's property or financial obligations. Texas Family Code § 5.46.
Texas courts will consider the maturity, business backgrounds, educational levels, prior marriage experiences, ages, and motivations of the parties, as additional considerations in determining the validity of an antenuptial agreement. Marsh v.Marsh (Tex.App. 1997), 949 S.W.2d 734, 741; Williams v. Williams
(Tex.App. 1986), 720 S.W.2d 246, 249. Furthermore, Texas courts interpret antenuptial agreements to the effect that, "almost without limitation, what the parties agree upon is valid, the parties are bound by the agreement they have made, and the fact that a bargain is a hard one does not entitle a party to be relieved therefrom if he assumed it fairly and voluntarily."Marsh, 949 S.W.2d at 740. The validity of an antenuptial agreement will be considered "on a case-by-case basis, looking to the entire atmosphere in which the agreement was made." Id. at 739.
Moreover, contrary to appellant's assertions, there is no mandate in Texas law that the value of the assets contained in the antenuptial agreement also must be provided in the agreement. For example, in Williams, supra, unreported, at 249, 251, the validity of an antenuptial agreement was upheld even though there was no value itemization of the property listed in that agreement. InWilliams, the appellant argued that certain property should not have been awarded to the appellee because it had not been specifically identified or described in the antenuptial agreement. However, the appellate court affirmed the trial court's award of the property in controversy to the appellee because its ownership was later attributed to the sole proprietorship, Louis E. Williams Jewels, and the antenuptial stated, "`all inventory, assets, accounts receivable and each and every item, material and immaterial, of that sole proprietorship known as Louis E. Williams Jewels (* * *)' [is] the separate property of appellee." Id. at 249. Additionally, under Texas law, an antenuptial agreement will not be invalidated due to a lack of disclosure of the assets of the parties to that agreement unless the court has first found that the agreement was unconscionable, when the challenging party executed the agreement voluntarily. Marsh, 949 S.W.2d at 738,743. In that case, the appellate court did not address the appellant's contention that the antenuptial agreement was invalid for lack of full and fair disclosure, because it had determined the agreement was not unconscionable. Id.
In the instant matter, appellant does not contend, and the facts do not show, that Sanford involuntarily or unfairly entered into the agreement. Indeed, the stipulation of facts states that Sanford entered into the antenuptial agreement "freely." Thus, the only issue which must be resolved in this assignment of error is whether the agreement provided a fair and reasonable disclosure of the property. In answering that question, we need only look to the language of the agreement itself, which expressly stated that Reva had an interest in 3,460 acres of land in Texas and rights to proceeds from any timber, oil, gas, or mineral production. The agreement further lists all of Reva's ownership of corporate stocks, and indicates that she has bank accounts, certificates of deposit, other interest proceeds, household furniture and an automobile. Finally, the agreement states that appellant owns a building in Ohio and has cash invested in his name.
As set forth in Williams, there is no requirement that an antenuptial agreement must include an itemization of the values of each party's properties in order to make such agreement valid. Instead, the issue of whether the property has been fairly and reasonably disclosed will be reviewed on a case-by-case basis and by looking at the entire atmosphere in which the agreement was made.
In reviewing the facts of this matter, both parties were mature adults and possessed business experience at the time of executing the agreement. Also, there was a stipulation that Sanford freely entered into the antenuptial agreement. Moreover, appellant's assignment of error focuses merely on the fact that Reva's assets listed in the agreement were not accompanied by a monetary valuation. In our review, we conclude that there is otherwise a complete description of the extent of Reva's assets. Indeed, the antenutpial agreement notified Sanford that she owned a one-third interest in 3,460 acres of land in Texas, along with the rights to proceeds from any timber, oil, gas, or mineral production; retained corporate stock in nine corporations; and possessed certain bank accounts, certificates of deposit, household furniture, an automobile, and interest. Consequently, we hold that based on the facts and circumstances of this case, there was a fair and full disclosure of each party's assets because Sanford was on notice of the extent of her property and, thus, had ample opportunity to inquiry as to the actual value of those assets.
In addressing this assignment of error, we have indulged the appellant's contentions with great latitude in light of the fact that, as articulated in Marsh, issues concerning a lack of disclosure of the assets in an antenuptial agreement will not be addressed until after such agreement has been determined to be unconscionable.[1] Importantly, appellant failed to argue the issue of unconscionability and, hence, waived his assigned issue concerning asset disclosure. Therefore, appellant's second assignment of error is not well-taken.
In appellant's third assignment of error, it is claimed that the trial court erred in its determination that the Texas property was not held by a partnership. Appellant further contends that if the property was held by a partnership, it would constitute personal intangible property and would then be includable as an asset of Reva's estate.
Pursuant to the laws of Texas, a "`partnership is an association of two or more persons to carry on as co-owners of a business for profit.' * * *" Grimmett v. Higginbotham
(Tex.App. 1994), 907 S.W.2d 1, 2. The burden of proving the existence of a partnership is imposed upon the party seeking to establish the relationship. Id. Finally, the "party asserting the formation of a partnership relationship must establish each of the following essential elements: (1) a community of interest in the venture; (2) an agreement to share profits; (3) an agreement to share losses; and (4) a mutual right of control or management of the enterprise." Id., citing Ayco Dev. Corp. v. G.E.T. Serv.Co. (Tex. 1981), 616 S.W.2d 184, 186. If any one of the four elements is not satisfied, then no partnership exists, as a matter of law. Id.
In its brief, appellant attempts to demonstrate that the Texas property was a partnership, but neglected to address the existence of the four factors set forth in Grimmett. Instead, appellant argued the existence of a partnership under Ohio law. In addition, the stipulated facts state that Reva was a one-third owner of the Texas property, while Mark was a two-third's owner. The facts also indicate that the property had been in the family for generations and had vested in Reva and Mark through their inheritances. Consequently, the record evidences that Reva and Mark possessed the land as tenants in common.
Under both Texas and Ohio law, the holding of land as tenants in common, coupled with the right to share in the profits of such land does not constitute a partnership. Furthermore, appellant has failed to demonstrate that the sharing in the profits indicated the establishment of a partnership rather than a tenant in common relationship. Thus, appellant's third assignment of error is meritless.
For the foregoing reasons, appellant's assignments of error are without merit, and the judgment of the Ashtabula County Court of Common Pleas, Probate Division, is affirmed.
NADER, J., O'NEILL, J., concur.
[1] "In determining whether a contract is unconscionable or not, the court must look to the entire atmosphere in which the agreement was made, the alternatives, if any, which were available to the parties at the time of the making of the contract; the non-bargaining ability of one party; whether the contract is illegal or against public policy, and, whether the contract is oppressive or unreasonable." Marsh, 949 S.W.2d at 740.